UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                              )
CHARLES REDDICKS,             )
                              )        CIVIL ACTION
               Petitioner,    )        No. 23-10455-WGY
                              )
        v.                    )
                              )
SUPERINTENDENT NELSON B ALVES,)
                              )
               Respondent.    )
_____)

YOUNG, D.J.                              December 4, 2024

**MEMORANDUM & ORDER**

Through this petition for a writ of habeas corpus brought
pursuant to 28 U.S.C. § 2254, Charles Reddicks ("Reddicks")
requests this Court vacate his convictions for second-degree
murder, carrying a firearm without a license, and carrying a
loaded firearm without a license, and order his release from
custody. Pet. 16, ECF No. 1. Reviewing Reddicks' claim
pursuant to the demanding standards that govern, this Court is
constrained to deny Reddicks' petition for the reasons explained
below.

I.    **INTRODUCTION**

      A.    **Procedural History**

      In January 2016, a jury convicted Reddicks of second-degree
murder, carrying a firearm without a license, and carrying a
loaded firearm without a license. Pet. 1; Commonwealth v.

Reddicks, 99 Mass. App. Ct. 1118 (2021) (unpublished).  Reddicks appealed his conviction to the Massachusetts Appeals Court ("the Appeals Court"), which affirmed his conviction on April 8, 2021.  Reddicks, 99 Mass. App. Ct.  Reddicks filed an application for further appellate review ("FAR") with the Massachusetts Supreme Judicial Court, which was denied on August 2, 2021.  Commonwealth v. Reddicks, 448 Mass. 1102 (2021).  Reddicks filed this petition for a writ of habeas corpus on February 27, 2023.  Pet.

**B.    Factual Background**

"In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. 2254(e)(1).  This memorandum therefore incorporates the factual recitation of the Appeals Court.

In Commonwealth v. Reddicks, the Appeals Court recited that on the evening of April 27, 2012, Reddicks drove to the victim's home in the Jamaica Plain neighborhood of Boston to purchase approximately one pound of marijuana, which he had set up earlier via text messages.  No. 19-P-71, 2021 WL 1307911, at *1.  After a call placed from Reddicks' cell phone to the victim's

cell phone, the victim exited his apartment with a sample of marijuana.  Id.  Soon after, the victim retrieved additional marijuana, and returned to the back hallway.  Id.  Three shots were then fired at the victim, two of which struck him, resulting in his death.  Id.  A witness, Leanne Parker ("Parker"), later told police that she had observed a Black man with long dreads or curls exit a blue vehicle and walk toward the victim's house while talking on the phone, shortly before the shooting.  Id. at *2.  Parker then heard gunshots and observed the man run from the house into the blue car and drive away.  Id.  The police traced a partial license plate number to a vehicle registered to Reddicks' grandmother.  Id.  Out of the six registered drivers living at that address, the police determined that Reddicks was the only one fitting Parker's description.  Id.  Sergeant Detective Daley ("Daley") testified about this investigative process at trial.  Id. at *8.  Reddicks was interviewed by Detective Callahan ("Callahan") and Daley, and admitted to driving the blue vehicle on the day of the homicide and to sending text messages to the victim to purchase marijuana.  Id. at *2.  Reddicks, however, stated that he had never met the victim in person and denied involvement in the homicide.  Id.  Reddicks was ultimately indicted for murder, armed robbery, carrying a firearm without a license, carrying a

loaded firearm without a license, and possession of ammunition without a license. Id.

Prior to trial, the trial justice allowed the Commonwealth's motion seeking to conduct a Criminal Offender Record Information ("CORI") inquiry of prospective jurors. Id. During jury empanelment, the CORI inquiry revealed that six jurors had not disclosed all or part of their criminal record on their jury questionnaires. Id. Four of those jurors were seated in the jury box without further inquiry. Id. After voir dire, the other two jurors were struck by the Commonwealth, exercising peremptory challenges. Id. at *2-3.

Prior to trial, Reddicks sought the exclusion of statements he made in his interview with Callahan and Daley. Id. at *9-10. Reddicks also moved to exclude two photographs depicting him holding a firearm, obtained in an unrelated prior case, alleging the invalidity of the search warrant that permitted the photographs to be obtained from his cell phone. Id. at *7. Those motions were denied. Id. at *7, *10. At trial, Reddicks objected to the testimony of his friend, Thomas Washington ("Washington"), who testified that several months before the homicide he saw Reddicks in possession of a firearm, and objected again to the admission of the photographs, alleging that those pieces of evidence were prior bad act evidence. Id. at *6. When deciding the motion in limine and at trial, the

court informed Reddicks' counsel that a cross-examination of Washington suggesting that he was lying might open the door to Reddicks' conviction for possessing the firearm in question. Id. at *11.  Reddicks' counsel did not cross-examine Washington. Id.

The jury convicted Reddicks of murder in the second degree, carrying a firearm without a license, and carrying a loaded firearm without a license.  Id. at *1.

## II.  ANALYSIS

### A.  Standard of Review

"In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

Habeas petitions seeking relief from state court convictions are reviewed under the highly deferential standard codified by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, which provides, in part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to

any claim that was adjudicated on the merits in State
court proceedings unless the adjudication of the
claim--
          (1) resulted in a decision that was contrary
to, or involved an unreasonable application of,
clearly established Federal law, as determined by the
Supreme Court of the United States; or
          (2) resulted in a decision that was based on
an unreasonable determination of the facts in light of
the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) ("Section 2254(d)").

     "A state court decision is contrary to clearly established

federal law if it 'contradicts the governing law set forth in

the Supreme Court's cases or confronts a set of facts that are

materially indistinguishable from a decision of the Supreme

Court' but reaches a different result." Companonio v. O'Brien,

672 F.3d 101, 109 (1st Cir. 2012) (quoting John v. Russo, 561

F.3d 88, 96 (1st Cir. 2009)).  "Clearly established law" refers

only to the holdings of Supreme Court decisions and the

governing legal principles set forth by the Supreme Court at the

time the state court renders its decision, and does not extend

to the dicta of Supreme Court decisions. Howes v. Fields, 565

U.S. 499, 505 (2012); Lockyer v. Andrade, 538 U.S. 63, 71-72

(2003).

     The "unreasonable application" branch applies when the

state court identified the correct legal principal but applied

it unreasonably to the facts in the case at hand. Williams v.

Taylor, 529 U.S. 362, 407-08 (2000).  A habeas court reviewing

this prong must ask if the state court's application was "objectively unreasonable." Id. at 409.  A petitioner meets this standard upon a showing that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011).

An unreasonable determination of the facts occurs when a state court's determination of facts is "objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Substantial deference is accorded to the state trial court's factual determination under this standard. Brumfield v. Cain, 576 U.S. 305, 314 (2015).  Factual determinations are not deemed unreasonable "merely because [the court] would have reached a different conclusion in the first instance." Id. at 313-14 (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)).  Even where "'[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" Wood, 558 U.S. at 301 (alteration in original) (quoting Rice v. Collins, 546 U.S. 333, 341-342 (2006)).

These standards apply only to claims that were adjudicated on the merits in state court proceedings.  Pike v. Guarino, 492 F.3d 61, 67 (1st Cir. 2007).  A federal claim not adjudicated on the merits is reviewed de novo.  Id.

Even if a federal court uncovers an error under Section 2254(d), relief is appropriate only if the error found "had substantial and injurious effect or influence in determining the jury's verdict."  Fry v. Pliler, 551 U.S. 112, 116 (2007) (quoting Brecht v. Abrahamson, 507 U.S. 619, 631 (1993)).  "Relevant factors to be considered in determining whether the jury was substantially swayed by the error include: '(1) the extent to which the error permeated the proceeding, (2) the centrality of the issue affected by the error to the case as actually tried, and (3) the relative strength of the properly admitted evidence of guilt.'"  Pettiway v. Vose, 100 F.3d 198, 200-01 (1st Cir. 1996) (quoting Levasseur v. Pepe, 70 F.3d 187, 193 (1st Cir. 1995)).

**B.    The Appeals Court's Decision Allowing CORI Inquiry of Prospective Jurors and the Subsequent Peremptory Challenges of Two Jurors Was Reasonable.**

Reddicks first argues that the practice of running criminal records searches for prospective jurors violates the Equal Protection Clause of the Fourteenth Amendment and the right to an impartial jury under the Sixth Amendment because it

disproportionally excludes jurors of color from juries.  Pet'r's Mem. Supp. Pet. ("Pet'r's Mem.") 23-27, ECF No. 2.  Reddicks argues that the review of criminal records of prospective jurors in his case specifically caused the exclusion of Black jurors for pretextual reasons.  Id. at 20.

The Commonwealth argues that habeas corpus relief cannot be granted, as no clearly established Supreme Court precedent exists concerning the practice of running criminal records searches for prospective jurors.  Resp't's Mem. Opp'n Pet. ("Resp't's Mem.") 19-24, ECF No. 15.  In addition, the Commonwealth argues that the Appeals Court correctly applied the relevant Supreme Court precedents concerning the striking of two jurors.  Id. at 24-28.

This Court concludes that Reddicks has not met his burden of proving that the Appeals Court unreasonably applied clearly established federal law.  Reddicks' petition on the first ground is thus denied.

### 1.  Background

Prior to trial, the Commonwealth filed a motion in limine seeking a CORI inquiry of the prospective jurors.  Reddicks, 2021 WL 1307911, at *2.  Reddicks opposed the motion and, in the alternative, requested that the prospective jurors' information also be run through the victim/witness database.  Id.  The trial justice allowed the Commonwealth's motion and ordered that the

prospective jurors' information be checked with both the CORI database and the victim/witness database.  Id.

During jury empanelment, the inquiry revealed that six jurors, all of whom were Black, had not disclosed all or part of their criminal record on their juror questionnaires.  Id. at *2, *4.  As to four of them, the Commonwealth and Reddicks agreed that no further inquiry was necessary.  Id. at *2.  During voir dire, juror no. 47 informed the trial justice that all of her undisclosed charges were dismissed and that she did not know that she was required to disclose dismissed charges.  Id.  The trial justice credited the juror's explanation and informed counsel that there was no reason to excuse the juror for cause. Id.  The Commonwealth then exercised a peremptory challenge, and Reddicks objected.  Id.  The trial justice excused juror no. 47 over Reddicks' objection.  Id.

It was also discovered that juror no. 122 had not disclosed a number of charges and convictions that had occurred over a fourteen-year period.  Id. at *3.  The juror explained that those charges and convictions were sealed and that he did not know that he was required to disclose sealed charges and convictions.  Id.  The trial justice accepted his explanation and declined to excuse the juror for cause.  Id.  The Commonwealth exercised a peremptory challenge, and Reddicks objected, arguing that the Commonwealth's practice of inquiring

into prospective jurors' criminal records resulted in the

systematic exclusion of Black jurors.  Id.  The judge noted the

objection, but excused juror no. 122, explaining that even

though he accepted the two jurors' explanations, those

explanations did not excuse them from fully revealing their

criminal history.  Id.

### 2.   The Appeals Court Decision

Following Reddicks' appeal of the trial justice's ruling

allowing the Commonwealth to conduct a CORI inquiry on

prospective jurors and the Commonwealth's peremptory challenges

to jurors nos. 47 and 122, the Appeals Court issued a ruling

affirming the trial justice's decisions.  Id. at *1.  Concerning

the practice of running prospective jurors' CORI, the Appeals

Court explained:

> The defendant, however, has failed to provide us
> with the factual basis or the constitutional standard
> to [determine that the practice of running prospective
> jurors' CORI is unconstitutional].  In supporting his
> claim, the defendant has done no more than argue that
> prospective jurors who are African-American are more
> likely to have a criminal record, and as such, are
> more likely to be excluded from jury service for that
> reason.  In doing so, he cites law review articles
> that assert this very proposition.  To be sure, the
> SJC, in recent decisions, has acknowledged that there
> is systemic racism present in the Commonwealth's
> criminal justice system that leads to disproportionate
> stops, frisks, searches, and in turn, arrests of
> people of color.  However, this observation, alone,
> does not provide us with a basis for declaring
> unconstitutional a practice specifically sanctioned by
> the SJC.

[11]

To begin with, the defendant has not set forth
the standard to be applied to his claim.  The
Commonwealth argues that, to show systemic
discrimination in jury selection, the defendant must
demonstrate that "(1) the group allegedly
discriminated against is a 'distinctive' group in the
community, (2) that the group is not fairly and
reasonably represented in the venires in relation to
its proportion of the community, and (3) that
underrepresentation is due to systematic exclusion of
the group in the jury selection process."  We agree.

It is undisputed that African-American jurors are
a distinctive group in the community, and specifically
that the two jurors who were ultimately excluded in
this case as a result [sic] the CORI inquiry were
African-American.  The defendant, however, has not
provided us with sufficient information regarding the
number of African-American jurors in his venire or in
past Suffolk County venires.  Nor is there any
information in the record about the racial composition
of the community from which the venire was drawn.
Accordingly, the defendant has failed to carry his
burden.  While "[a] criminal defendant is
constitutionally entitled to a jury selection process
free of systematic discrimination against his grouping
in the community," on this record, we cannot conclude
that permitting the Commonwealth to check the CORI of
prospective jurors is inconsistent with that right.

Moreover, we note that, contrary to the
defendant's contentions, the CORI inquiry conducted by
the Commonwealth did not result in the exclusion of
jurors simply for having a criminal record.  In fact,
the judge did not excuse for cause any of the jurors
who had a criminal record but failed to disclose it,
and perhaps more significantly, the majority of the
jurors who failed to make the requisite disclosure,
all of whom were African-American, were seated on the
jury without a voir dire being conducted.  Only juror
no. 47 and juror no. 122, who arguably had more
significant charges on their record, were questioned
by the judge about their lack of disclosure.  Though
the judge recognized that individuals with dismissed
charges or sealed records often misinterpret their
obligation with regard to disclosure, and found that
both jurors' omissions were inadvertent, the
prosecutor had an independent duty to ensure that "a
qualified and impartial jury" was selected.  A

properly exercised peremptory challenge serves that
purpose.

Id. at *3-4 (alteration in original) (footnotes omitted)

(citations omitted).  Concerning the Commonwealth's two

peremptory challenges, the Appeals Court further explained:

> First, when the prosecutor exercised a peremptory
> challenge to juror no. 47, the defendant objected, but
> not on the ground of discriminatory exclusion.
> Rather, defense counsel stated that she was preserving
> her objection to the Commonwealth conducting a CORI
> inquiry in the first place.  At this point, no mention
> of discriminatory purpose had been made, and
> accordingly, the defendant's objection failed to
> "trigger an obligation on the judge's part to make a
> finding whether the presumption of propriety was
> rebutted."  While a trial judge may raise a Batson-
> Soares violation sua sponte, the judge here did not
> abuse her discretion in failing to do so where the
> challenge was in direct response to the juror failing
> to disclose her criminal record.
>
> Secondly, after it was learned that juror no. 122
> had an extensive and undisclosed criminal record, the
> prosecutor exercised a peremptory challenge, and the
> defendant objected raising the issue of race for the
> first time.  However, in his objection, the defendant
> did not argue that the prosecutor was improperly
> challenging the juror based on the juror's race, nor
> did he specifically raise a Batson-Soares objection.
> Instead, he argued that the practice of checking
> prospective jurors' CORI, in Suffolk County, leads to
> the exclusion of African-American jurors from the
> jury.  It is the defendant's burden to not only state
> his objection to the Commonwealth's peremptory
> challenge, but also to state the grounds for that
> objection.  Although we agree with the defendant that
> he need not specifically cite Batson-Soares, a general
> objection is likely insufficient to preserve such a
> challenge.
>
> Moreover, even if we were to determine that the
> defendant properly raised a Batson-Soares objection to
> the strike of prospective juror no. 122, a conclusion
> we do not reach, "[w]e will not overturn the judge's
> ruling if there is a sound basis in the record for her

[13]

ruling."  The judge, in her response to defense
counsel's objection, implicitly determined that the
requisite showing of impropriety had not been made.
While rebutting the presumption of propriety is "not
an onerous task," the defendant must show "that the
totality of the relevant facts gives rise to an
inference of discriminatory purpose."

Here, the strike exercised by the Commonwealth
against juror no. 122 "appeared to be made for obvious
reasons that did not raise any inference of bias."
Initially, juror no. 122 was seated on the jury and
the Commonwealth expressed contentment with the juror.
It was only after the CORI inquiry revealed that juror
no. 122 failed to "faithfully disclose [his] criminal
history" that the Commonwealth exercised a peremptory
challenge.  The judge, accordingly, determined that
the Commonwealth was entitled to exercise such a
challenge at that point because the juror's CORI was
"a piece of information that was not available to [the
prosecutor] at the time of his vetting."  Though the
defendant is also African-American, there were, in
total, five African-American jurors seated on the
sixteen-person jury.  Based on the totality of the
facts and circumstances here, the judge did not abuse
her discretion in concluding that the defendant failed
to meet his burden of showing the impropriety of the
prosecutor's peremptory challenge to prospective juror
no. 122.

Id. at *5-6 (alteration in original) (footnotes omitted)

(citations omitted).

> 3.    **The Appeals Court's Decision Was Not Based on an
>        Unreasonable Application of Supreme Court
>        Precedent.**
>
>> a.    **The CORI Inquiry of Prospective Jurors**
>>
>>> i.  **Reddicks' Equal Protection Claim Under
>>>     the Fourteenth Amendment**

The Supreme Court has consistently reaffirmed the principle

that racial discrimination during jury selection violates the

Equal Protection Clause.  Batson v. Kentucky, 476 U.S. 79, 84

(1986).  Purposeful racial discrimination denies a defendant the protection that a jury trial is intended to secure and the right to a jury "composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds."  Id. at 86 (quoting Strauder v. West Virginia, 100 U.S. 303, 308 (1879)).  Moreover, racial discrimination does not only harm the defendant, but also harms the excluded jurors and extends to "touch the entire community."  Id. at 87.  It is relevant here to note that Batson was decided in the context of a prosecutor's use of peremptory challenges purposefully to discriminate against and exclude all Black persons on the venire.  Id. at 100.  Later Supreme Court cases applied and extended Batson to other forms of discrimination.  J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127 (1994) (holding that intentional discrimination based on gender in the use of peremptory strikes during jury selection violates the Equal Protection Clause); Powers v. Ohio, 499 U.S. 400 (1991) (holding that defendant may object to race-based exclusion of jurors through peremptory challenges, whether or not defendant and excluded jurors share the same race); Flowers v. Mississippi, 588 U.S. 284 (2019) (finding Batson violation based on a pattern of strikes spanning several trials and other circumstantial evidence).

Reddicks argues that the Appeals Court imposed too high a burden when it assessed whether there was systemic discrimination against a protected class within the venire. Pet'r's Mem. 18-20. Reddicks reaffirms that he claims a violation of the Equal Protection Clause based on the exclusion of two jurors and that the Appeals Court confused his claim with a claim alleging systemic exclusion of Black jurors. Id. Therefore, Reddicks argues that the Appeals Court ought have applied the Batson test. Id.

The habeas corpus standard commands this Court to look at the application of any clearly established Supreme Court precedent and to determine whether this application was reasonable. Wright v. Van Patten, 552 U.S. 120, 126 (2008) (habeas relief pursuant to Section 2254(d)(1) not authorized where no Supreme Court cases gave a "clear answer to the question presented, let alone one in [the petitioner's] favor"); Carey v. Musladin, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from this Court . . . it cannot be said that the state court 'unreasonably applied clearly established Federal law.'" (citation omitted)).

Here, Reddicks challenges the practice of running searches of prospective jurors' criminal records. Pet'r's Mem. 17-27. Batson and its progeny, however, address the discriminatory use of peremptory challenges, and do not address whether checking

prospective jurors' criminal records during empanelment violates the Equal Protection Clause. Batson and its progeny, therefore, cannot be applied as clearly established federal law governing this issue. Wright, 552 U.S. at 125. As no clearly established law exists on this issue, this Court necessarily defers to the Appeals Court's thorough decision. Carey, 549 U.S. at 77.

### ii. Reddicks' Right to an Impartial Jury Claim Under the Sixth and Fourteenth Amendments

The Supreme Court has held that a trial by jury requires an impartial jury drawn from a representative cross-section of the community. Ballard v. United States, 329 U.S. 187, 192 (1946) (citing Thiel v. Southern Pac. Co., 328 U.S. 217, 220 (1946)). The Supreme Court has explained this to mean that "prospective jurors shall be selected by court officials without systematic and intentional exclusion of a group." Id. at 192-93 (quoting Thiel, 328 U.S. at 220). In both Ballard and Thiel, the Supreme Court reaffirmed this principle -- at the heart of the jury system -- in the context of the exclusion of a whole group from the jury panel. Ballard, 329 U.S. at 193 ("[T]he purposeful and systematic exclusion of women from the panel in this case was a departure from the scheme of jury selection which Congress adopted . . . ."); Thiel, 328 U.S. at 224 ("[A] blanket exclusion of all daily wage earners, however well-intentioned and however justified by prior actions of trial judges, must be

[17]

counted among those tendencies which undermine and weaken the institution of jury trial.").

Here, Reddicks cites to Ballard and Thiel, arguing that the Commonwealth's practice violated Reddicks' right to an impartial jury of his peers. Pet'r's Mem. 26. Those cases are, however, distinguishable from Reddicks' case and cannot be considered as clearly established federal law for the purpose of the petition review. Indeed, Reddicks challenges the exclusion of two Black jurors, not the exclusion of all Black jurors from the panel. Pet'r's Mem. 17-23. Therefore, as no clearly established law exists on this issue, this Court again necessarily defers to the Appeals Court's decision. Carey, 549 U.S. at 77; Wright, 552 U.S. at 126.

### b.   The Peremptory Challenges

In Batson, the Supreme Court strongly reaffirmed that "racial discrimination in jury selection offends the Equal Protection Clause" and that "[s]election procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." 476 U.S. at 85, 87. To make a claim of racial discrimination in the exercise of peremptory challenges, the defendant must first establish a prima facie case of purposeful discrimination. Id. at 92-97. When the defendant has made his prima facie case, the "burden shifts to the State to come forward with a neutral

[18]

explanation for challenging black jurors." Id. at 97.  Finally, the court must decide whether the explanation is adequate or if it is a pretext for discrimination.  Id. at 97-98.

The issue in this case is whether the Appeals Court's determination at the first step of Batson was reasonable.  Under Batson, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." Johnson v. California, 545 U.S. 162, 168 (2005) (quoting Batson, 476 U.S. at 93-94).  A defendant may do so by "offering a wide variety of evidence." Id. at 169.  First, the defendant is "entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" Batson, 476 U.S. at 96 (quoting Avery v. State of Georgia, 345 U.S. 559, 562 (1953)).

In evaluating whether discrimination occurred, courts may consider a variety of factors including:

> statistical evidence about the prosecutor's use of
> peremptory strikes against black prospective jurors as
> compared to white prospective jurors in the case;
> evidence of a prosecutor's disparate questioning and
> investigation of black and white prospective jurors in
> the case; side-by-side comparisons of black
> prospective jurors who were struck and white
> prospective jurors who were not struck in the case; a
> prosecutor's misrepresentations of the record when
> defending the strikes during the Batson hearing;
> relevant history of the State's peremptory strikes in

past cases; or other relevant circumstances that bear
upon the issue of racial discrimination.

Flowers, 588 U.S. at 301-02.  The presence of an apparent race-
neutral reason for the strike is another important factor.

Sanchez v. Roden, 753 F.3d 279, 302 (1st Cir. 2014).  Courts
note that the composition of the jury itself is a factor that
should be assessed in context, and that the presence of one or
several Black jurors cannot be the only reason to allow a
Batson-challenged strike.  Id. at 299-300; Commonwealth v.
Jones, 477 Mass. 307, 325 (2017).  Courts around the country
have held that the fact that a juror has a criminal record or
failed to disclose it is an adequate race-neutral reason to
strike a prospective juror.  See United States v. Forrest, 402
F.3d 678, 687 (6th Cir. 2005) (holding that a record of criminal
charges and a negative reaction to being called as a juror are
adequate race-neutral reasons to excuse a juror); United States
v. Wilcox, 487 F.3d 1163, 1170 (8th Cir. 2007) (holding that a
prospective juror's criminal record is a proper race-neutral
reason for excusing him); Fields v. Thaler, 588 F.3d 270, 277
(5th Cir. 2009) (holding that a juror's failure to disclose his
own conviction for driving while under the influence is a race-
neutral reason to strike the juror); United States v. Brown, 553
F.3d 768, 796 (5th Cir. 2008) (observing that a prospective
juror's lack of veracity on his juror form as to a criminal

conviction provides a clearly legitimate reason for the exercise of a peremptory challenge); Commonwealth v. Grier, 490 Mass. 455, 468 (2022) (affirming the trial judge's ruling excusing a juror who did not disclose multiple prior arrests and charges, which raised concerns as to his candor and level of comprehension).

Here, the Appeals Court rejected Reddicks' challenge to the peremptory strikes of juror no. 47 and juror no. 122, holding that no Batson objection was properly raised, and that, even if it was, the court did not abuse its discretion in determining that Reddicks had failed to raise an inference of discrimination, as required by the first step of the Batson test. Reddicks, 2021 WL 1307911, at *5-6. In reaching this conclusion, the Appeals Court considered that even the juror whose removal was challenged on race-based grounds was excused for the obvious reason that he had failed faithfully to disclose his criminal history on the jury questionnaire. Id. at *6. Both jurors provided explanations for their failure to disclose, and the trial justice credited those explanations as "absolutely reasonable" when declining to excuse the jurors for cause. Id. at *2-3. The fact that those jurors were not excused for cause, however, does not prevent the prosecution from exercising peremptory challenges against them. Flowers, 588 U.S. at 293

(observing that "peremptory strikes traditionally may be used to remove any potential juror for any reason").

Moreover, the trial justice took into consideration that there were in total five Black jurors seated on the sixteen-person jury. Reddicks, 2021 WL 1307911, at *3, *6. Information regarding other potentially relevant factors is scarce: here, the record reflects that all six jurors who failed faithfully to disclose their criminal history were Black, and that two of them were excused by the Commonwealth. Reddicks, 2021 WL 1307911, at *2-3. The Appeals Court had no opportunity to engage in a side-by-side comparison between the jurors or a broader inquiry into discriminatory patterns, as it was presented with no information regarding the racial composition of the venire, of past venires, or of the community from which the venire was drawn. Id. at *4. By contrast, in Flowers the Supreme Court devoted a significant part of its analysis to the State's dramatically disparate questioning of Black and white prospective jurors, and to side-by-side comparisons of Black prospective jurors who were struck and white prospective jurors who were not struck. 588 U.S. at 307-15. There, the record was detailed enough that the Supreme Court was able to identify that the State had asked the five struck Black prospective jurors a total of 145 questions, against twelve questions asked to the eleven seated white jurors. Id. at 308. In addition, the Court was able to

[22]

identify that while the State struck a Black prospective juror because she knew several defense witnesses, it did not strike three white prospective jurors who also knew many individuals involved in the case. Id. at 312. Those factors, along with the concerning history of the State's peremptory strikes in Flowers' first four trials and the fact that in the trial at issue the State had struck five of the six Black prospective jurors, led the Supreme Court to conclude that at least one of the peremptory strikes was motivated in substantial part by discriminatory intent. Id. at 304-07. See also Johnson, 545 U.S. at 173 (holding that a prima facie case under Batson had been established when "the inference of discrimination was sufficient to invoke a comment by the trial judge that 'we are very close,' and on review, the California Supreme Court acknowledged that 'it certainly looks suspicious that all three African-American prospective jurors were removed from the jury'"); Miller-El v. Dretke, 545 U.S. at 265-66 (holding that clear and convincing evidence showed that the prosecution's strikes were racially determined when: no facts other than race could explain the strikes; the prosecution used shuffling and disparate questioning during the selection; the prosecution expressed pretextual positions; and the prosecution's notes showed the use of a jury selection manual that included racial stereotypes); Sanchez, 753 F.3d at 304 (holding that an

inference of racial discrimination was raised when the side-by-side comparison of a white juror and a Black juror showed that the only significant difference between them was race, and the government struck only the Black juror).

For these reasons, this Court concludes that the Appeals Court's decision that Reddicks did not establish a prima facie case of discriminatory intent was not contrary to or an unreasonable application of clearly established federal law. This Court therefore denies Reddicks' petition for a writ of habeas corpus on this ground.

### C.   Reflections on **Batson** and Massachusetts Jury Practice

The text in Section II.B above satisfactorily sets forth the factual record, identifies the controlling legal principles, and properly applies them.  Yet, the result is far from satisfactory.

Why?

Because Massachusetts classifies a significant cohort of its citizens as "criminal offenders" even though none of them has ever been convicted of any crime.  What's more, this group is disproportionately composed of people of color.  Elizabeth Tsai Bishop et al., Harvard Law Sch., Crim. Just. Pol'y Program, Racial Disparities in the Massachusetts Criminal System 36 (2020), https://hls.harvard.edu/wp-content/uploads/2022/08/Massachusetts-Racial-Disparity-Report-

[24]

FINAL.pdf.  Significantly, the Massachusetts Criminal Offender
Record Information ("CORI") system includes arrest records along
with records of conviction.  So it is that a citizen whose sole
brush with the law is his arrest at a boisterous party which got
out of hand, the charges later dropped, will continue to turn up
as a "criminal offender" though he is, of course, presumed
innocent of the dropped charges and his conduct is otherwise
spotless.  One need to look no further to recognize the systemic
racism which Chief Justice Budd lamented in <u>Commonwealth</u> v.
<u>Williams</u>.  481 Mass. 443, 451 n.6 (2019) (Budd, J.).

    Within our criminal justice system, explicit and implicit
bias are both prevalent.  Willamette Univ. Coll. of L. Racial
Just. Task Force, <u>Remedying Batson's Failure to Address</u>
<u>Unconscious Juror Bias in Oregon</u>, 57 Willamette L. Rev. 85, 88
(2021).  Explicit bias is related to an individual's conscious
beliefs.  <u>Id.</u>  Good examples of explicit bias are overt racism
and racist comments.  <u>Id.</u>  Explicit and implicit bias are
related but differ in that implicit bias is an unconscious bias
that operates via attitudes or stereotypes that affect our
understanding, decisions, and actions in an unconscious manner.
<u>Id.</u> at 89. (citing Cheryl Statts et al., Kirwan Inst. for the
Study of Race & Ethnicity, <u>State of the Science: Implicit Bias</u>
<u>Review</u> 62 (2015)).

Implicit bias can affect every individual.  Id.  Because
implicit bias is unconscious, it can occur without individuals
realizing that it influences their thoughts and actions.  Id.
Research has established that people can hold implicit bias
against their own group and against out-of-group members.  Id.
at 89-90.  There is no exception for those directly involved in
the criminal justice system, including judges, lawyers, and
potential jurors.  It therefore has affected the legal system in
many ways and continues to do so today.  Id. at 89-91; Melissa
L. Breger, Making the Invisible Visible: Exploring Implicit
Bias, Judicial Diversity, and the Bench Trial, 53 U. Rich. L.
Rev. 1039, 1051-57 (2019).

The courts, and society in general, have been aware of the
presence of explicit bias for years.  Hon. Mark W. Bennett,
Unraveling the Gordian Knot of Implicit Bias in Jury Selection:
The Problems of Judge Dominated Voir Dire, the Failed Promise of
Batson, and Proposed Solutions, 4 Harv. L. & Pol'y Rev. 149, 151
(2010).  This assessment is heightened as studies on judicial
decision-making have shown that judges rely heavily on their
intuition when they decide problems, and often feel compelled to
make decisions quickly.  Id. at 156-57; L. Song Richardson,
Systemic Triage: Implicit Racial Bias in the Criminal Courtroom,
126 Yale L.J. 862, 882 (2017) (reviewing Nicole Van Cleve, Crook
County: Racism and Injustice in America's Largest Criminal Court

[26]

(2016)).  There is some evidence that, with sufficient motivation, training, and information, however, judges and lawyers can compensate for the influence of those biases. Bennett, supra, at 157; Teyah S. Giannetta et al., Eliminating Bias in the Courtroom?: A Content Analysis of Judges' Opinions Regarding Implicit Bias Training, 54 U. Mem. L. Rev. 1, 28 (2023) ("[M]ost judges believed judicial education on implicit bias would aid courts in reducing implicit bias in the courtroom.").

An American citizen has the right to serve on a jury regardless of race, national origin, or gender.  See Strauder, 100 U.S. at 310; J.E.B., 511 U.S. at 146; Carter v. Jury Comm'n of Greene Cnty., 396 U.S. 320, 330 (1970).  Demographic characteristics have, however, for decades, been used by lawyers to shape juries to their advantage.  Anna Offit, Race-Conscious Jury Selection, 82 Ohio St. L.J. 201, 207 (2021).

Moreover, the history of opposition to Black citizens' service on juries is significant, long, and part of a larger history of systemic discrimination and violence against Blacks. Timothy J. Conklin, The End of Purposeful Discrimination: The Shift to an Objective Batson Standard, 63 B.C. L. Rev. 1037, 1047-49 (2022).  The Supreme Court first wrote on the issue in Strauder v. West Virginia, in which the Court held that race-based exclusions from jury service were unconstitutional and

violated the Equal Protection Clause.  Id.; Strauder, 100 U.S.
at 310.  More than fifty years after Strauder, discrimination
persisted, and even though more Black citizens were called for
jury service, the discriminatory use of peremptory challenges
often prevented them from being seated as jurors.  Conklin,
supra, at 1047-49.  In 1984, the Supreme Court established a
more searching purposeful discrimination threshold.  Batson, 476
U.S. at 96-98.  The Court later extended the same prohibition to
gender and sex-based peremptory challenges.  J.E.B., 511 U.S. at
146.

The Batson standard and its progeny, however, have not
eradicated discrimination in juror selection.  Conklin, supra,
at 1049.  Since its publication Batson has engendered many
criticisms.  Id. at 1038-39.  While Justice Thurgood Marshall
agreed with the majority holding, he argued in a concurring
opinion that the three-step analysis had two core flaws: (1) a
lawyer who intends to discriminate purposefully could easily
provide an unprejudiced reason for the strike; and (2) a lawyer
who does not intentionally discriminate may still be
consciously, or unconsciously, motivated by discriminatory
reasons.  Batson, 476 U.S. at 106 (Marshall, J., concurring).
Justice Marshall also argued that a judge's ruling on a
peremptory challenge could similarly be distorted by "conscious
or unconscious racism."  Id.  This led Justice Marshall to argue

that peremptory challenges should be prohibited in criminal
trials.  Id.; Conklin, supra, at 1038.

Indeed, a major problem with the Batson standard is its
inability to address situations where honest, well-intentioned
lawyers and judges nevertheless discriminate because of the
influence of implicit bias.  See Antony Page, Batson's Blind-
Spot: Unconscious Stereotyping and the Peremptory Challenge, 85
B.U. L. Rev. 155, 179-80 (2005).  As explained earlier,
unconscious discrimination occurs almost inevitably due to the
normal cognitive processes that form stereotypes.  Id.  It
therefore seems that the more we know about implicit bias, and
how it is formed and maintained, the more the Batson standard
becomes irrelevant and ineffective.  See Bennett, supra, at 163-
65.  Indeed, as stated in Batson's majority opinion, peremptory
challenges constitute a jury selection practice that permits
"those to discriminate who are of a mind to discriminate."
Batson, 476 U.S. at 96 (quoting Avery, 345 U.S. at 562).

What to do?

- abolish peremptory challenges?

It is not surprising to note that the most recurring
solution proposed by scholars to Batson's flaws is the abolition
of peremptory challenges.  Bennett, supra, at 165-69; Conklin,
supra, at 1089-91; Page, supra, at 245-46; Willamette Univ.
Coll. of L. Racial Just. Task Force, supra, at 117-19; Colleen

P. Graffy, Harry M. Caldwell & Gautam K. Sood, First Twelve in the Box: Implicit Bias Driving the Preemptory Challenge to the Point of Extinction, 102 Or. L. Rev. 355, 400-403 (2024). Frankly, this is unlikely in view of the unanimous support of peremptory challenges by the trial bar nationwide.

- limit peremptory challenges?

Since it was decided, courts have continued to identify flaws in the application of Batson, Conklin, supra, at 1039 n.10, and since 2018 at least seven state supreme courts -- in California, Connecticut, Iowa, Massachusetts, New Jersey, Utah, and Washington -- and the Oregon Court of Appeals have considered implicit bias's effect on Batson's efficacy, id. at 1057 n.119. California, Connecticut, New Jersey, and Washington have commissioned working groups to study the role of implicit bias in jury selection, among other issues, and to recommend modifications to their states' Batson framework. Id. at 1058.

The Supreme Court of Washington took a significant step in 2018, adopting a new rule (General Rule 37 or GR37) and framework for discerning litigant bias.[1] Offit, supra, at 242.

---

[1] GR37 was the product of the collaborative labor of a workgroup convened by the Supreme Court of Washington, drawing on input from the American Civil Liberties Union (ACLU) and Washington Association of Prosecuting Attorneys (WAPA), among others. See Proposed New GR 37 - Jury Selection Workgroup: Final Report, Wash. State Cts. (2018),

Stating in a related case that the Batson protections are not
sufficient to combat racial discrimination, State v. Jefferson,
192 Wash. 2d 225, 239 (2018), the court replaced the third part
of the Batson test with a new inquiry into whether an "objective
observer could view race or ethnicity as a factor in the use of
the peremptory challenge," Wash. Ct. Gen. R. 37(e).  The new
rule adds that the objective observer would be someone aware
that implicit, institutional, and unconscious biases, along with
purposeful discrimination, result in the unfair exclusion of
jurors.  Wash. Ct. Gen. R. 37(f).  Moreover, the new rule
prohibits using certain characteristics and dispositions as
neutral reasons for strikes because of their historical
association with racial exclusion.  Wash. Ct. Gen. R. 37(h).
The new rule encourages parties to object to suspect peremptory
strikes and to deliberate during voir dire.  Offit, supra, at
244.  As this rule implicitly recognizes, increased knowledge
about implicit bias should push judges and lawyers to recognize
and emphasize that various non-racial experiences and
characteristics are inherently linked to race and therefore may
constitute illegitimate grounds for striking and dismissing
potential jurors.  Id. at 246.  Rule 37 includes, for example,

---

http://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20
Orders/OrderNo25700-A-1221Workgroup.pdf.

having prior contact with law enforcement officers or living in a high-crime neighborhood as presumptively invalid reasons for a strike.[2]  Wash. Ct. Gen. R. 37(h).

Washington is not the only state to have reformed the Batson standard.  Willamette Univ. Coll. of L. Racial Just. Task Force, supra, at 104.  California adopted rule AB-3070, which specifies presumptively invalid reasons for excluding a juror. Id.  The presumption of invalidity may be overcome only if the party exercising the peremptory challenge can show by clear and convincing evidence that the rationale for using the challenge was unrelated to a prospective juror's membership in a protected class, and that the reasons articulated bear on the prospective juror's ability to be fair and impartial in the case.[3]  Id.

---

[2] A growing scholarly consensus asserts that making these experiences a legitimate basis for challenging jurors will result in discriminatory empanelment.  Offit, supra, at 246 (citing Anna Roberts, Casual Ostracism: Jury Exclusion on the Basis of Criminal Convictions, 98 Minn. L. Rev. 592, 602 (2013)).  Scholars also argue that emphasizing the influence of implicit bias and its consequences can push lawyers to avoid using this kind of information as part of their decision-making process during jury selection.  Id.

[3] It is, of course, a misnomer to call this a "presumption" of invalidity.  It is nothing of the sort.  Cf. Fed. R. Evid. 301; Peter Murray, Basic Federal Evidence 65-69 (2024).  This is not a true presumption at all; it is a powerful burden shifting rule.  Of course, the Supreme Court of California is in good company.  The so-called "presumption" of patent validity and "presumption" of presidential official acts work the same way and are similarly imprecise.

The Supreme Judicial Court of Massachusetts took a similar step, recognizing the reality of Black citizens' disparate treatment in the criminal justice system when it stated that a "juror may not be excused for cause merely because he or she believes that African-American males receive disparate treatment in the criminal justice system." Williams, 481 Mass. at 451; see Offit, supra, at 243-44.

- Enhance the role of the trial judge?

The Supreme Court has recognized that "the job of enforcing Batson rests first and foremost with trial judges," who "possess the primary responsibility to enforce Batson and prevent racial discrimination from seeping into the jury selection process." Flowers, 588 U.S. at 302.

With this in mind, here's a protocol that I've learned to follow to address Batson's deficiencies.

Every time a peremptory challenge is exercised against a racial or ethnic minority, I ask, "Why?" Simply asking the question operates as a strong deterrent to any further such peremptory challenges against minorities in that particular case.

My experience has been that in about half of the cases counsel responds with an appropriate, case specific, race-neutral explanation. The Court then allows the challenge without comment.

[33]

In a very few cases, counsel's demeanor coupled with a deer-in-the-headlights response so obviously masks a racial motivation that it becomes my duty to call it out on the record, disallow the challenge, and seat the juror. After all, it is the juror's constitutional right to serve. See Carter, 396 U.S. at 330; but see United States v. Bowles, 751 F.3d 35, 38 (1st Cir. 2014) (Souter, J.) (deeming it possible error to seat a juror based on sua sponte Batson inquiry without prior indication of discriminatory purpose or pattern[4]).

Most often, counsel's answer, while facially race-neutral, calls for further inquiry. For example, suppose counsel challenges based on the fact that the juror works in the health care field and another unchallenged white juror does as well. That disparity needs to be followed up. Usually the resultant colloquy results in the challenged juror being excused after I've expressed varying levels of skepticism or disapprobation. The practical result is that a juror -- perhaps impartial and fully qualified -- is excused. Consistently, however, once the colloquy has occurred, no other potential juror from that racial

---

[4] One may question whether this reasoning remains sound now that Flowers has firmly reiterated that even a single discriminatory peremptory challenge in a criminal case violates the Equal Protection Clause. 588 U.S. at 300, 303. Nevertheless, this Court is mindful that it may apply Supreme Court precedent in the face of established First Circuit precedent only at its peril. United States v. Moore-Bush, 963 F.3d 29, 36-37 (1st Cir. 2020).

or ethnic group will be challenged.  That's about the best I can do to breathe life into Batson.

> **D.    The Appeals Court's Decision Affirming the Denial of the Motion to Suppress Reddicks' Statements Was Reasonable.**

Reddicks argues that the Appeals Court erred in affirming the trial justice's decision that several statements Reddicks made during an interrogation were voluntary, when evidence showed that the detectives used improper interrogation tactics. Pet'r's Mem. 27-31.  The Commonwealth argues that the trial justice correctly applied the voluntariness test and that, in affirming the lower court's decision, the Appeals Court considered all relevant factors.  Resp't's Mem. 34-38.

This Court concludes that Reddicks has not met his burden of proving that the Appeals Court unreasonably applied clearly established federal law.  Reddicks' petition on this second ground is thus denied.

> ### 1.    Background

During an interview with two police detectives, Reddicks made several statements which he later filed a motion to suppress.  Reddicks, 2021 WL 1307911, at *2, *9-10.  The motion was denied.  Id.  The trial justice found that the detectives improperly conveyed to Reddicks that the interview was his only opportunity to tell his side of the story, and improperly suggested that his silence and denials could be used against him

[35]

in court.  Id. at *10.  The trial justice, however, concluded
that despite those improper tactics, Reddicks' statements were
voluntary.  Id.

### 2.  The Appeals Court Decision

On appeal, Reddicks argued that the trial justice erred in
denying the motion to suppress, arguing that considering the
detectives' improper tactics, his statements were not voluntary.
Id. at *9.  The Appeals Court affirmed the trial justice's
denial of the motion to suppress, explaining:

> The defendant next claims that statements made by
> him during an interview with Detective Callahan and
> Sergeant Detective Daley were not voluntary and should
> have been suppressed.  "[I]n reviewing a ruling on a
> motion to suppress, we accept the judge's subsidiary
> findings of fact absent clear error but conduct an
> independent review of his ultimate findings and
> conclusions of law."  "[W]e 'review de novo any
> findings of the motion judge that were based entirely
> on the documentary evidence.'"
> "A voluntary statement is one that is 'the
> product of a rational intellect and a free will,' and
> not induced by physical or psychological coercion."
> "The test for voluntariness is 'whether, in light of
> the totality of the circumstances surrounding the
> making of the statement, the will of the defendant was
> overborne to the extent that the statement was not the
> result of a free and voluntary act.'"  "Factors
> relevant to the totality of the circumstances include
> whether promises or other inducements were made to the
> defendant by the police, as well as the defendant's
> age, education, and intelligence; experience with the
> criminal justice system; and his physical and mental
> condition, including whether the defendant was under
> the influence of drugs or alcohol."  In addition, "the
> 'use of false information by police during an
> interrogation is deceptive and is a relevant factor
> indicating a possibility that the defendant's
> statements were made involuntarily.'"

During the interview, Detective Callahan made statements to the defendant suggesting that the defendant's silence and denial could be used against him in court.  Specifically, Detective Callahan stated,

> "[T]his is a golden opportunity to give your version of the story because a year down the road, two years down the road we're going to be in a courtroom and I'm going to be sitting across from you, maybe both, or Rich Daley and if I'm there, it's me, I'm going to be looking at you.  I'm going to be sitting up there in a suit and tie.  I'm going to be looking at you, and I'm going to be saying I gave him, Sergeant Daley gave him, the opportunity to offer a reason as to why he did what he did, as opposed to not saying anything and me looking over at the jury as I'm looking back to you and everything that is going to come out of our investigation to the jury is going to be that Charles Reddicks is a cold-blooded killer.  That he robbed dude, shot dude over nothing.
> As opposed to you telling us, there's got to be a viable reason you do what you did.  You can -- Charles you can deny it all you want but you're there, we've got you there."

We agree with the motion judge that these statements were improper and were akin to the "now-or-never" language that was deemed impermissible in [Commonwealth v. Novo, 442 Mass. 262 (2004)].  In an attempt to get the defendant to confess his motive for the murder, the detective improperly suggested to the defendant that his failure to provide that information, and his denial of committing the murder, could be used against him in court, which is "plainly untrue."  We, however, also agree with the motion judge that the Commonwealth met its burden of proving that the defendant's statements were nevertheless voluntary.

On the date of the interview, the defendant was eighteen years old, and was a student at the Community Academy.  During the interview, the defendant admitted

to knowing someone by the name of "Mario," admitted to
sending him text messages on the date of the homicide
to purchase marijuana, and further admitted to knowing
the difference between an automatic weapon and a
revolver.  However, none of the incriminating
statements made by the defendant were tied to "or
otherwise made in response to the pressure tactics
employed by the officers."  The improper statements
made by Detective Callahan were designed to elicit a
motive for the murder, or put another way, a
confession.  Throughout the interview, however, the
defendant never wavered in denying his involvement in
the murder.  In short, the detective's improper
tactics were unsuccessful.  As the motion judge
concluded, the defendant's behavior during the
interview reflects "a young man who made limited,
carefully chosen responses."  The defendant remained
calm during the interview, and acted in a manner that
revealed that he was not "at the mercy of the
interrogating officers."  Based on the totality of the
circumstances here, the defendant's will was not
overborne by the improper statements made by the
detective.  There was no error in the denial of the
motion to suppress.

Reddicks, 2021 WL 1307911, at *9-10 (footnotes omitted)

(citations omitted).

### 3. The Appeals Court's Decision Was Not Based on an Unreasonable Application of Supreme Court Precedent.

A statement or confession must be voluntary in order to be

admitted into evidence, pursuant to both the Fifth Amendment

protection against self-incrimination and the Due Process Clause

of the Fourteenth Amendment.  See Dickerson v. United States,

530 U.S. 428, 433 (2000).  In Miranda v. Arizona, the Supreme

Court strongly affirmed that the right against self-

incrimination applies during all in-custody interrogations, and

[38]

that to ensure that every accused person or suspect can properly exercise this privilege, the accused "must be adequately and effectively apprised of [his or her] rights and the exercise of those rights must be fully honored."  384 U.S. 436, 467 (1966). Moreover, no distinction should be drawn between inculpatory statements and exculpatory statements, as the latter are often used to impeach the defendant's testimony, demonstrate untruths, and prove guilt by implication.  Id. at 476-77.  Therefore, no incriminating statements made during in-custody interrogations can be used unless the defendant received a full warning of his rights, including the right to remain silent, and voluntarily and effectively waived those rights.  Id. at 475-77.  The "[o]pportunity to exercise these rights must be afforded to [the accused] throughout the interrogation."  Id. at 479.  The requirement that Miranda warnings be given does not, however, dispense with the voluntariness inquiry, which remains the "ultimate test."  Culombe v. Connecticut, 367 U.S. 568, 602 (1961); Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). The test is as follows:

> Is the confession the product of an essentially free and unconstrained choice by its maker?  If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

Culombe, 367 U.S. at 602.

The determination of voluntariness "depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." Dickerson, 530 U.S. at 434 (alteration in original) (quoting Stein v. New York, 346 U.S. 156, 185 (1953)).  To make this determination, courts consider the totality of the circumstances, including the characteristics of the accused, such as age and education, and the details of the interrogation, such as the length of the detention, the repeated and prolonged nature of the questioning, and the use of physical force.  Schneckloth, 412 U.S. at 226.

Here, Reddicks challenges whether his will, in making the incriminating statements, was overborne by the detectives' improper statements during his interrogation or, in other words, whether Reddicks' statements were voluntary, considering the detectives' improper interrogation tactics.  The Appeals Court took into consideration the fact that Reddicks was eighteen years old on the date of the interview, that he was a high school student, and the substance of what he admitted to after the detective improperly used false statements.  Reddicks, 2021 WL 1307911, at *10.  In doing so, the Appeals Court correctly applied the test of voluntariness pursuant to applicable Supreme Court precedent.  Indeed, the detectives' statements were designed to elicit from Reddicks either a motive for the homicide or a confession.  Id.  Nevertheless, Reddicks continued

[40]

to deny his involvement in the homicide altogether. <u>Id.</u>  Given
the need to balance the circumstances of pressure against the
power of resistance of the person confessing, the nature of
Reddicks' admission was relevant to the voluntariness analysis.
<u>Dickerson</u>, 530 U.S. at 434; <u>see also</u> <u>Commonwealth</u> v. <u>Durand</u>, 457
Mass. 574, 596-98 (2010).  Here, despite his age and the
detectives' improper statements, Reddicks continued to deny his
involvement in the homicide.  This shows Reddicks' resistance to
the detectives' improper tactics and allows this Court to
conclude that the Appeals Court's decision that Reddicks'
statements were voluntary was reasonable.

Reddicks has not met his burden of proving that the Appeals
Court unreasonably applied Supreme Court precedent, and his
petition for a writ of habeas corpus on this ground is thus
denied.

> **E.   The Appeals Court's Decision Affirming the Allowance
> of Evidence from Reddicks' Cell Phone Search and
> Barring Him from Challenging the Search Again Was
> Reasonable.**

Reddicks argues that the Appeals Court's decision that
Reddicks had the same opportunity and incentive to litigate a
motion to suppress evidence derived from a search of his cell
phone in a prior case was based on an unreasonable determination
of the facts.  Pet'r's Mem. 31-33.  Moreover, Reddicks argues
that the Appeals Court should have considered a change in the

relevant law between the motion to suppress in the prior case and the one in the present case, and that not doing so was contrary to established Supreme Court precedent.  Id. at 33-38. The Commonwealth argues that this Court is barred from reviewing the claim because the Appeals Court rejected the claim on an independent state-law ground.  Resp't's Mem. 39.

This Court concludes that Reddicks has not met his burden of proving that the Appeals Court unreasonably applied clearly established federal law or based its decision on an unreasonable determination of the facts.  Reddicks' petition on this ground is thus denied.

### 1.  Background

On March 2, 2012, the police applied for a search warrant for Reddicks' cell phone in connection with an unrelated prior case.  Suppl. Answer 267-71, ECF No. 11-1; Reddicks, 2021 WL 1307911, at *7.  The police seized photographs of the defendant holding a silver revolver with a black handle.  Reddicks, 2021 WL 1307911, at *7.  Reddicks was charged with assault and battery with a dangerous weapon and carrying a firearm without a license.  Id. at *6 n.15.  Reddicks, arguing that the warrant to search his cell phone lacked the required probable cause, sought to suppress the evidence discovered on his phone.  Suppl. Answer 240-45, 254-66.  The motion to suppress was denied, Suppl. Answer 346-348, and Reddicks subsequently pleaded guilty to the

charges in the case, Reddicks, 2021 WL 1307911, at *7.  Before
trial in the present case, Reddicks moved to exclude the
photographs seized during Reddicks' previous case.  Reddicks,
2021 WL 1307911, at *7; Suppl. Answer 158-170.  The trial
justice allowed the introduction of the photographs.  Suppl.
Answer 110.

### 2.    The Appeals Court Decision

On appeal, Reddicks argued that the search warrant
authorizing the search of his cell phone lacked the requisite
probable cause.  Reddicks, 2021 WL 1307911, at *7.  The
Commonwealth opposed Reddicks' claim, arguing that Reddicks was
collaterally estopped from re-litigating this issue because it
had already been resolved during the earlier assault and battery
case.  Id.  The Appeals Court affirmed the trial justice's
denial of Reddicks' motion to suppress, on the ground of
collateral estoppel.  Id.

### 3.    The Appeals Court's Affirmation of the Trial Justice's Ruling Was Based on a Reasonable Determination of the Facts and Reasonable Application of Supreme Court Precedent.

The independent and adequate state ground doctrine
precludes federal district courts from addressing state
prisoners' claims in habeas corpus actions when the state court
has resolved the claim on a state-law ground that is
"independent of the federal question and adequate to support the

[43]

judgment." <u>Coleman</u> v. <u>Thompson</u>, 501 U.S. 722, 729-31 (1991). Habeas relief will be barred as long as the state "regularly follows the rule and has not waived it by relying on some other ground," <u>Jewett</u> v. <u>Brady</u>, 634 F.3d 67, 76 (1st Cir. 2011), and the rule is not applied so exorbitantly as effectively to defeat review of federal claims, <u>Lee</u> v. <u>Kemna</u>, 534 U.S. 362, 376 (2002).

The doctrine of collateral estoppel provides that a defendant is estopped from relitigating an issue when (1) the issues in the two proceedings are identical; (2) the party estopped had sufficient incentive to litigate the issue fully and vigorously; (3) the party estopped was a party to the previous litigation; (4) the applicable law is identical in both proceedings; and (5) the first proceeding resulted in a final judgment on the merits such that the defendant had sufficient incentive and opportunity to appeal. <u>Commonwealth</u> v. <u>Cabrera</u>, 449 Mass. 825, 829 (2007). This doctrine is firmly established in Massachusetts jurisprudence. <u>See</u> <u>Commonwealth</u> v. <u>Williams</u>, 431 Mass. 71, 74 (2000); <u>Commonwealth</u> v. <u>Ringuette</u>, 60 Mass. App. Ct. 351, 356-57 (2004).

### a.  Factual Reasonableness

Here, the Appeals Court concluded that Reddicks had sufficient incentive to litigate the validity of the search warrant due to the "nature of the significant charges against

[him]." Reddicks, 2021 WL 1307911, at *7. Reddicks was charged
in the prior case with assault and battery with a dangerous
weapon and carrying a firearm without a license. Id. at *6
n.15. In addition, the Appeals Court took into consideration
that Reddicks pleaded guilty in the prior case and, in doing so,
gave up his right to challenge the denial of his suppression
motion via trial and appeal, rendering the judgment final with
regard to the suppression issue. Id. at *7. In the present
case, Reddicks is serving a life sentence with the possibility
of parole after fifteen years for second-degree murder, a
concurrent sentence of five years to five-years-and-one-day for
carrying a firearm without a license, and an additional one-day
sentence for carrying a loaded firearm without a license. Pet.;
Suppl. Answer 112-13. This Court credits that there is a
significant difference between the nature of the charges in the
prior case and those in the present case. This difference,
however, especially considering that Reddicks pled guilty in the
prior case, is not significant enough to conclude that the
Appeals Court applied the collateral estoppel doctrine
exorbitantly.

Therefore, this Court concludes that the Appeals Court's
decision was not based on an unreasonable determination of the
facts.

### b. Reasonable Application of Supreme Court Precedent

Reddicks argues that after the initial motion to suppress was decided the law applicable to this issue significantly changed, such that the usual rules of collateral estoppel should not have applied. Pet'r's Mem. 35-36. Reddicks cites to three decisions that he argues significantly changed the probable cause requirement for a cell phone search warrant: Commonwealth v. White, 475 Mass. 583 (2016); Commonwealth v. Dorelas, 473 Mass. 496 (2016); and Riley v. California, 573 U.S. 373 (2014). Id. at 36. Reddicks moved to exclude the contents of the cell phone search conducted in the prior case on January 12, 2016, and the motion was denied on the same day. Suppl. Answer 110. White and Dorelas were decided by the Supreme Judicial Court after the trial justice considered Reddicks' motion in limine, and thus are not considered in this Court's analysis.[5] White,

---

[5] Even though they were issued too late to be used in this case, the two Supreme Judicial Court cases cited by Reddicks did operate to work an important change in the determination of the probable cause requirement to search cell phones. The Supreme Judicial Court concluded that "probable cause to search or seize a person's cellular telephone may not be based solely on an officer's opinion that the device is likely to contain evidence of the crime under investigation," White, 475 Mass. at 584-85, but "[r]ather police first must obtain information that establishes the existence of some 'particularized evidence' related to the crime," id. at 589-90 (quoting Dorelas, 473 Mass. at 502). It is only when the police "believe, based on training or experience, that this 'particularized evidence' is likely to be found on the device in question, [that] they have probable cause to seize or search the device in pursuit of that

475 Mass. at 583; <u>Dorelas</u>, 473 Mass. at 496.  In <u>Riley</u>, the Supreme Court held that a cell phone seized incident to an arrest generally may not be searched without first obtaining a warrant, but did not deal with the probable cause standard or particularity requirement applicable to the search warrant. <u>Riley</u>, 573 U.S. at 385-86.  Therefore, <u>Riley</u> did not significantly change the law governing a cell phone search warrant's particularity requirement.  Reddicks thus fails to show that the law governing the particularity requirement applicable to cell phone search warrants changed significantly between the denial of the motion in limine in the prior case and the denial in the case under consideration here.

    This Court thus concludes that the Appeals Court correctly applied the doctrine of collateral estoppel, and that the independent and adequate state ground doctrine precludes it from addressing Reddicks' Fourth and Fourteenth Amendments claims concerning the search of his cell phone.

    This Court therefore denies Reddicks' petition for a writ of habeas corpus on the ground that the search of his cell phone violated his Fourth and Fourteenth Amendments rights.

---

evidence," <u>White</u>, 475 Mass. at 589 (citing <u>Dorelas</u>, 473 Mass. at 498, 503), and even then police must conduct their search with "special care" to avoid searching files not related to the warrant, <u>Dorelas</u>, 473 Mass. at 502.  Dorelas was decided on January 14, 2016, a mere two days after Reddicks' motion in limine was decided.  <u>Dorelas</u>, 473 Mass.

F.    **The Appeals Court's Decision Affirming the Admission of Evidence Showing Prior Firearm Possession Was Reasonable.**

Reddicks attacks the admission of evidence showing his prior firearm possession as "only marginally relevant" and prejudicial, and argues that the Commonwealth improperly used the evidence during its closing argument to make a propensity argument in violation of the Due Process Clause. Pet'r's Mem. at 38-40. In addition, Reddicks asserts that this Court ought review the claim de novo because the Appeals Court did not make mention of the Commonwealth's allegedly improper comment in its closing. Id. at 40. The Commonwealth argues that it cannot be concluded from the mere absence of a mention of the allegedly problematic closing argument that the trial justice bypassed the federal due process issue entirely. Resp't's Mem. 49-53.

This Court concludes that Reddicks is not entitled to review de novo on this ground and that the Appeals Court's decision was reasonable.

### 1.    Background

At trial, a friend of Reddicks testified that he observed him in the possession of a silver revolver with a black handle several months before the homicide. Reddicks, 2021 WL 1307911, at *6. Moreover, the Commonwealth introduced two photographs from Reddicks' phone picturing him holding a silver revolver with a black handle. Id.

[48]

## 2.    The Appeals Court Decision

Reddicks objected to the admission of this evidence at trial, but the Appeals Court decided that the trial justice did not err in admitting the evidence, explaining:

> [E]vidence that the defendant possessed a weapon prior to the commission of a weapons related crime may be admissible "to show that the defendant had access to or knowledge of firearms and bullets."  "The critical questions are whether the weapons-related evidence is relevant and, if so, whether the probative value of the evidence is substantially outweighed by its prejudicial effect."  The decision to admit such evidence is left to the sound discretion of the trial judge, and we will not disturb that decision "absent palpable error."
>
> Here, the Commonwealth introduced the two photographs of the defendant holding a silver revolver, as well as the testimony of Washington, to demonstrate that the defendant had access to firearms, and more specifically revolvers, just four months prior to the homicide.  There was testimony before the jury that, of the possible seventeen firearms that could have been used as the murder weapon, fifteen of those firearms were in fact revolvers.  Accordingly, the challenged firearm evidence was relevant, and we discern no abuse of discretion in the judge's determination that the probative value of this evidence was not substantially outweighed by its prejudicial effect.  Further, immediately following Washington's testimony, the judge provided a limiting instruction to the jury cautioning them that they were only permitted to consider the defendant's prior possession of a firearm as evidence that the defendant had "familiarity with or access to firearms."  The judge specifically instructed the jurors that there was no evidence that the firearm, testified to by Washington, was the same firearm used during the homicide.  We presume the jury followed these instructions, and perceive no prejudicial error by the admission of this evidence.

Id. at *6-7 (footnote omitted) (citations omitted).

3.    **The Appeals Court's Affirmation of the Trial Justice's Ruling Was Based on a Reasonable Determination of the Facts and Reasonable Application of Supreme Court Precedent.**

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, 562 U.S. 86, 99 (2011); see also Johnson v. Williams, 568 U.S. 289, 298-301 (2013). The presumption may be cast aside only when "the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court." Johnson, 568 U.S. at 303.

Here, the Commonwealth argues that by examining whether the admission of the evidence constituted a prejudicial error, the Appeals Court adjudicated the federal constitutional issue on the merits, therefore precluding review de novo. Resp't's Mem. 50-53; see Lyons v. Brady, 666 F.3d 51, 54 (1st Cir. 2012) (holding that the Supreme Judicial Court adjudicated the petitioner's federal due process claim on the merits, even though it did not elaborate its reasoning, because the constitutional argument was included in the petitioner's brief and the court concluded that there was no merit in the allegations of error). This Court agrees with the Commonwealth,

especially considering that the record does not present any evidence that the Appeals Court overlooked any federal claim.

As the Commonwealth points out, there is no clearly established Supreme Court precedent that addresses whether the admission of propensity evidence violates the Due Process Clause.  Resp't's Mem. 53.  At the same time, however, "[a] misbegotten evidentiary ruling that results in a fundamentally unfair trial may violate due process and, thus, ground federal habeas relief."  Coningford v. Rhode Island, 640 F.3d 478, 484 (1st Cir. 2011).

Here, the Appeals Court's application of state evidence standards conformed with federal evidentiary principles, which in turn supports an inference that due process was honored.  See Robertson v. Ryan, No. 16-CV-10609, 2019 WL 2501481, at *8 (D. Mass. June 17, 2019) (Burroughs, J.).  In addition, the prosecutor referred to the testimony and the firearms photographs in his closing argument to argue to the jurors that they could infer that Reddicks had access to revolvers, which was likely the type of firearm used for the murder.  Resp't's Answer, Ex. 10, Trial Tr. Morn. Day Nine 53-54, ECF No. 11-11.[6]

---

[6] The prosecutor's closing argument on this issue stated:

You know that Charles Reddicks had access to guns, and I'm saying guns with an S, plural, to make sure the Court Reporter gets it and you get it because

This is consistent with the trial justice's limiting instruction that the evidence could only be considered as showing Reddicks' access to or familiarity with firearms.  Reddicks, 2021 WL 1307911, at *7.

Keeping in mind the strict habeas corpus review standard, this Court concludes that the Appeals Court's decision was not based on an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law.  This Court therefore denies Reddicks' petition for a writ of habeas corpus on the ground that the use of propensity evidence during closing arguments violated his federal due process rights.

---

you have evidence that he had access to firearms, multiple.

First, you've got Thomas Washington who testified from that witness stand that he saw Charles Reddicks a few months before the murder sticking a silver-colored revolver with a black handle inside of his waistband.

And, yes, it looks an awful lot like the picture we have here.  But here's the scariest part of the whole story.  We don't know if the gun that Thomas Washington saw him with in December is the same gun that's pictured here.

We don't know if it's the same gun that's pictured here.  All we know is that it's a silver revolver.  All of them are revolvers.

Trial Tr. Morn. Day Nine 53.

G.   **The Appeals Court's Decision Affirming the Trial Court's Indirect Restriction of the Scope of Cross-Examination Was Reasonable.**

Reddicks argues that the Appeals Court's decision to uphold the trial justice's indirect restriction of his cross-examination of a witness was based on an unreasonable determination of the facts.  Pet'r's Mem. 40-42.  The Commonwealth opposes, and argues that the Appeals Court's decision was not contrary to or an unreasonable application of any clearly established Supreme Court precedent.  Resp't's Mem. 72-74.

This Court concludes that Reddicks has not met his burden of proving that the Appeals Court unreasonably applied clearly established federal law or based its decision on an unreasonable determination of the facts.  Reddicks' petition on this fifth ground is thus denied.

### 1.   Background

Prior to trial, Reddicks filed a motion in limine seeking to exclude the testimony of Thomas Washington ("Washington"), wherein he planned to testify that he had observed Reddicks commit a shooting with a weapon similar to the one used in the crime at issue in 2011.  Suppl. Answer 233-45.  The trial justice excluded any testimony relating to the commission of a prior shooting; however, Washington's observation of Reddicks in possession of a firearm was determined relevant and admissible.

Resp't's Resp., Ex. 1, Mots. Lim. Tr. 72-73, ECF No. 11-2.  The
trial justice warned Reddicks' defense counsel that if she
suggested on cross-examination that Washington was lying about
his observation, this could open the door to the introduction
into evidence of Reddicks' prior conviction.  Id. at 76-78;
Reddicks, 2021 WL 1307911, at *11.[7]  Defense counsel did not
cross-examine Washington.  Reddicks, 2021 WL 1307911, at *11.

### 2.  The Appeals Court Decision

On appeal, Reddicks argued that he was impermissibly
restricted from cross-examining Washington.  Id.  The Appeals
Court disagreed.  Id.

---

[7] The trial justice stated the following during the motion
in limine hearing:

> If you start attacking Mr. Washington's
> credibility and arguing to the Court, don't believe
> Mr. Washington, he's a liar, you know, my client never
> possessed that gun, that is a false narrative, because
> we all know that your client admitted to it.
>     I'm just warning you, Ms. Scapicchio, I don't
> want to make any prejudgments here, the farther you go
> down that road, I think that that conviction could
> come in.  If you argue not to believe Mr. Washington,
> it strikes me as unfair to the Commonwealth not to
> introduce the conviction if that's the tack you're
> going to take.
>     It's uncontroverted your client pled guilty to
> doing just that.  If you take the tack that Mr.
> Washington is a liar, don't believe him, your client's
> conviction -- you could be opening the door to the
> admission of your client's conviction.

Mots. Lim. Tr. 76-77.  Before Washington's examination, the
trial justice gave the same warning.  Resp't's Resp., Ex. 4,
Trial Tr. Day Three 222-24, ECF No. 11-5.

3.    **The Appeals Court's Affirmation of the Trial Justice's Ruling Was Based on a Reasonable Determination of the Facts and Reasonable Application of Supreme Court Precedent.**

a.    **Factual Reasonableness**

Here, the Appeals Court ruled that the trial justice "did not wholly restrict [Reddicks] from cross-examining [Washington]."  Id.  Indeed, during the hearing on the motion in limine and before Washington's examination, the trial justice warned defense counsel that if she was to argue that Washington was lying and should not be believed, the prior conviction "could come in."  Mots. Lim. Tr. 76-77.  The trial justice only used general terms and warned defense counsel against making the argument that Washington was lying.  See Reddicks, 2021 WL 1307911, at *11.  The trial justice did not, however, state that "any avenue of questioning [would] have opened the door to the conviction and underlying facts," as Reddicks alleges.  Pet'r's Mem. 41.

The Appeals Court's determination that the trial justice did not "wholly restrict" the possibility of cross-examination was therefore not based on an unreasonable determination of the facts, and this Court denies Reddicks' petition for a writ of habeas corpus on this ground.

            b.    **Reasonable Application of Supreme Court
                   Precedent**

     The right to cross-examination is not an absolute right and
may be restricted by trial judges for appropriate purposes.
Delaware v. Fensterer, 474 U.S. 15, 20 (1985) ("[T]he
Confrontation Clause guarantees an opportunity for effective
cross-examination, not cross-examination that is effective in
whatever way, and to whatever extent . . . ."); Delaware v. Van
Arsdall, 475 U.S. 673, 679 (1986) ("[T]rial judges retain wide
latitude insofar as the Confrontation Clause is concerned to
impose reasonable limits on . . . [defense counsel's] cross-
examination [for bias] based on concerns about, among other
things, harassment, prejudice, confusion of the issues, the
witness' safety, or interrogation that is repetitive or only
marginally relevant.").

     Here, had defense counsel made the argument that
Washington's testimony was a lie, when the Court knew that
Reddicks himself had pled guilty to the conduct alleged and the
Commonwealth might then have introduced the conviction itself,
it could have confused the issues for the jury.  The trial
justice's comments on the cross-examination were therefore not
improper.  Indeed, Reddicks' counsel was allowed to cross-
examine Washington as she wished.  Reddicks, 2021 WL 1307911, at
*11.  The trial justice only stated that, if Reddicks' counsel
were to cross-examine on this issue, those questions might by

their very nature open the door to evidence of Reddicks' prior conviction.  Id.  Reddicks' right to cross-examine was thus not significantly diminished.

Therefore, the Appeals Court's decision was not based on an unreasonable interpretation of Supreme Court precedent, and this Court denies Reddicks' petition for a writ of habeas corpus on this ground.

### H.    The Appeals Court's Decision Affirming the Allowance of the Detective's Testimony Was Reasonable.

At trial, the Commonwealth introduced the testimony of Daley.  Id. at *8.  The Appeals Court described Daley's testimony as follows:

> At trial, Sergeant Detective Daley testified that, upon interviewing Parker on the date of the murder, he obtained a partial license plate number and a physical description of the defendant and the vehicle he was operating.  Another detective conducted a query of the partial license plate number in the Registry of Motor Vehicles database and discovered that the vehicle was a 1992 blue Ford Escort registered to Catherine Reddicks at 116 Millet Street.  The detective then conducted a search of that address in the Registry of Motor Vehicles database and learned that three males and three females were registered drivers at that location.  At this point, Sergeant Detective Daley testified that only one of those registered drivers looked similar to the physical description provided by Parker; that individual was the defendant.  Sergeant Detective Daley then identified the defendant in court.  Contemporaneously, the judge instructed the jury that they were not to consider Sergeant Detective Daley's testimony as an identification of the defendant by Parker.

Id. (footnotes omitted).

[57]

### 1.  The Appeals Court Decision

On appeal, Reddicks argued that Daley's testimony was improper lay opinion and constituted both an impermissible in-court identification of Reddicks and an improper identification of Reddicks' grandmother Catherine Reddicks' vehicle from surveillance footage presented at trial.  Id. at *2, *9.  The Appeals Court rejected those claims, explaining:

> The defendant is correct that "[m]aking a determination of the identity of a person from a photograph or video image is an expression of an opinion," and that such an identification by a lay witness is admissible only "when the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess."  However, the defendant is incorrect in his assertion that this is what occurred here.
>
> Sergeant Detective Daley was not shown a photograph of the defendant to identify at trial. Rather, the detective merely testified that he obtained a photograph of the defendant from the Registry of Motor Vehicles database, and connected the defendant to the crime based on the physical description provided by Parker as well as the partial license plate number that led him to the defendant's address.  Contrary to the defendant's claim, at trial there was no lay opinion identification made by Sergeant Detective Daley based on a photograph of the defendant.
>
> Additionally, there was no "back-door" admission of an in-court identification of the defendant by Parker. . . .  Parker did not identify the defendant in-court, and Sergeant Detective Daley did not testify that she had.  Instead, Daley merely testified to the steps taken by the detectives during the course of the investigation that ultimately led them to narrow their focus on the defendant.  This was permissible in light of the fact that, in his defense, the defendant attacked the nature and quality of the police investigation. . . .

        > The defendant also claims that Sergeant Detective Daley improperly identified Catherine Reddicks's vehicle from Massachusetts Bay Transportation Authority surveillance footage presented at trial. However, contrary to the defendant's contentions, Sergeant Detective Daley did not identify at trial the blue Ford Escort from video surveillance footage. Daley testified only to the steps he took in locating the vehicle and connecting it to the crime based on the partial license plate number he obtained from a witness on the date of the murder.

Id. at *8-9 (footnotes omitted) (citations omitted).

### 2. The Appeals Court's Affirmation of the Trial Justice's Ruling Was Based on a Reasonable Determination of the Facts and Reasonable Application of Supreme Court Precedent.

#### a. Factual Reasonableness

As the Appeals Court observed, determining the identity of a person from a photograph or video image is an expression of an opinion. Id. at *8. A lay witness identification in this manner will therefore only be admissible when "the subject matter to which the testimony relates cannot be reproduced or described to the jury precisely as it appeared to the witness at the time," and "the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess." Commonwealth v. Wardsworth, 482 Mass. 454, 475 (2019) (citations omitted). The lay witness here, however, did not make such an identification.

Here, the Appeals Court pointed out that the prosecutor did not show Daley a photograph of Reddicks to identify during trial. Reddicks, 2021 WL 1307911, at *8. Rather, Daley's

testimony was only a description of the steps that detectives
had taken in their investigation.  <u>Id.</u> at *9.  Similarly, the
Appeals Court observed that Daley did not identify in court
Reddicks' grandmother's vehicle from the surveillance video
introduced at trial, but rather described the steps that led him
to the car in his investigation.  <u>Id.</u>  Moreover, the Appeals
Court pointed out that Daley did not testify that Parker had
identified Reddicks in court.  <u>Id.</u>  Finally, the trial justice
gave a limiting instruction informing the jury that the
testimony should not be construed as an identification of
Reddicks by Parker.  <u>Id.</u> at *8.

The Appeals Court's rulings that Daley's testimony did not
constitute a lay opinion identification, and that there was no
"back-door" in-court identification of Reddicks by Parker or of
Reddicks' grandmother's car, were reasonable interpretations of
the factual record.

### b.    Reasonable Application of Supreme Court Precedent

Reddicks argues that the state court's decision allowing
Daley's testimony violated his federal due process rights.
Pet'r's Mem. 44.  Reddicks would be entitled to habeas corpus
relief if he could show that the state court's evidentiary
decisions rendered his trial fundamentally unfair.  <u>Coningford</u>,
640 F.3d at 484.

Here, the Appeals Court reasonably determined that Daley's testimony was relevant and admissible. See Reddicks, 2021 WL 1307911, at *8-9. Moreover, the jury received the trial justice's very clear instruction that the testimony was offered "for the limited purpose of helping [the jury] understand what steps the police took in this investigation and why they took them, and for no other reason." Resp't's Answer, Ex. 8, Trial Tr. Day Seven 97, ECF No. 11-9.

Therefore, even were this Court to hold that the challenged evidentiary decisions were erroneous, those decisions simply did not render Reddicks' trial fundamentally unfair in light of the record as a whole. This Court denies Reddicks' petition for a writ of habeas corpus on this ground.

**III. CONCLUSION**

Reddicks has not met his burden of proving that the Appeals Court's decision pertaining to any of his current claims involved an unreasonable application of Supreme Court precedent or was based on an unreasonable determination of the facts. Moreover, even had any of Reddicks' arguments passed muster, any error therefrom had no substantial and injurious effect or influence on the jury's verdict. For these reasons, Reddicks' petition for a writ of habeas corpus, ECF No. 1, is **DENIED** and this action is **DISMISSED**. The Clerk is directed to enter a separate order of dismissal and close the case.

Pursuant to 28 U.S.C. § 2253(c)(2) and Rule 11(a) of Rule Governing Section 2254 Cases in the United States District courts, a certificate of appealability is hereby issued as to all issues raised in the petition because Reddicks has made a substantial showing of the denial of a constitutional right inasmuch as "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" <u>Slack</u> v. <u>McDaniel</u>, 529 U.S. 473, 484 (2000) (quoting <u>Barefoot</u> v. <u>Estelle</u>, 463 U.S. 880, 893 n.4 (1983)).

**SO ORDERED.**

                              /s/ William G. Young
                              WILLIAM G. YOUNG
                                    JUDGE
                                   of the
                              UNITED STATES[8]

---

[8] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 46 years.